UNITED STATES DISTRICT COURT

EASTERN DIVISION OF KENTUCKY

COVINGTON DIVISION

DAVID A. SCHNEIDER,

Plaintiff,                    CASE NO. 05-123-DLB

vs.

DENNIS R. MOLONY, M.D., et al.,

Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~

TELEPHONIC DEPOSITION OF

KRIS LEE SPERRY, M.D.

December 4, 2007

2:09 p.m.

1740 Peachtree Street, NW

Atlanta, Georgia

Kathleen Cilenti, CCR B-594

1                    APPEARANCES OF COUNSEL

2   On behalf of the Plaintiffs:
    (Via telephone)
3   JOHN H. METZ, Esq.
          44th Floor Carew Tower
4         441 Vine Street
          Cincinnati, Ohio    45202
5         513.241.8844
          513.241.6090 FAX
6         Metzlegal@aol.com
7
8   On behalf of the Defendant:
9   (Via telephone)
10  FRANK V. BENTON IV, Esq.
11        528 Overton Street
12        PO Box 72218
13        Newport, Kentucky   41072-0218
14        859.291.0500
15  859.291.4050 FAX
16  BBLLaw@fuse.net
17                    ---
18              INDEX OF EXAMINATION
19  WITNESS:
20  Kris Lee Sperry, M.D.
21

22  EXAMINATION                              Page
23  By Mr. Benton                            3
24  EXAMINATION
25  By Mr. Metz                              43

```
 1        Telephonic Deposition of Kris Lee Sperry, M.D.
 2                   December 4, 2007
 3
 4            KRIS LEE SPERRY, M.D., having been first
 5   duly sworn, was examined and testified as follows:
 6        CROSS-EXAMINATION
 7        BY-MR.BENTON:
 8        Q.    Dr. Sperry, my name is Frank Benton and I
 9   represent Dr. Moloney in this matter.  You've been
10   listed as a witness or a potential witness in this
11   case.  The purpose of this deposition, just in case
12   you have not been through the process, is to find out
13   what opinions you might hold relative to this case.
14            Dr. Sperry, would you state your full
15   name, please, for the record.
16        A.    Sure.  My name is Kris Lee Sperry.
17        Q.    What is your present business address,
18   sir?
19        A.    It would be -- well, my home is 170 Nixon
20   Road in Senoia, Georgia.  And my office is at the
21   Georgia Bureau of Investigation, Division of Forensic
22   Sciences, at 3121 Panthersville Road, in Decatur,
23   Georgia.
24        Q.    Okay.  And what is your specialty, sir?
25        A.    I'm a pathologist, and most specifically a
```

```
 1    forensic pathologist, but I have board certifications
 2    in anatomic pathology, clinical pathology, and
 3    forensic pathology.
 4         Q.    And do you have a CV handy, by any chance?
 5         A.    Yes, I do, I brought one.
 6               MR. BENTON:  Oh, good.  Why don't we have
 7         that marked as Exhibit 1 -- that will save a lot
 8         of time -- and just have that attached as an
 9         exhibit to the deposition, if that's all right
10         with you.
11               THE WITNESS:  Of course.  That's why I
12         brought it.
13               MR. BENTON:  That would be great.
14               (Defendant's Exhibit-1 was marked for
15         identification.)
16         Q.    (By Mr. Benton)  Just give me a little bit
17    of what your day-to-day, you know, workday is like.
18    What are you doing these days?
19         A.    Sure.  I'm the chief medical examiner for
20    the State of Georgia and I'm a forensic pathologist.
21    Primarily, I supervise a death investigation system
22    that encompasses 153 of the 159 counties in the state
23    of Georgia.  So primarily my office deals with sudden
24    and unexpected deaths throughout the state.
25               I also have a separate entity within my
```

```
 1   office which deals with the examination of living
 2   children, elderly individuals, and mentally
 3   handicapped individuals who are suspected to be
 4   victims of abuse or neglect or who have various
 5   medical problems that also are or possibly may be
 6   related to or contributed to by abuse or neglect.
 7        Q.    All right.  And are there other physicians
 8   within your office that would encompass other
 9   specialties, such as internal medicine, family
10   medicine, that type of thing, or do you do the whole
11   ball of wax?
12        A.    No, we are all pathologists, so there
13   are -- some of the other physicians have some
14   experience with family medicine, surgery, to some
15   extent, and pediatrics.  But all of us, at this point
16   in time our main focus is pathology.
17        Q.    Okay.  And are you actively involved or
18   are you more administrative these days?
19        A.    No, I still perform autopsies.  The last
20   time I was -- well, I'll be on the day after tomorrow
21   actually, and I was on a couple of days last week.  I
22   do about 150 to 175 autopsy examinations a year.  And
23   then also I'm actively involved in the evaluation of
24   the individuals I mentioned earlier that are thought
25   to be victims of abuse or neglect.
```

```
 1        Q.    I see.  And you work in conjunction with
 2   the prosecuting offices, the various prosecuting
 3   offices?
 4        A.    Yes, exactly, and law enforcement and the
 5   State Department of Family and Children Services and
 6   Department of Human Resources, yes.
 7        Q.    As a consequence of that, do you have any
 8   other experience -- or not experience but any other
 9   work description in addition to what we've discussed
10   so far?
11        A.    No.  My official title is chief medical
12   examiner for the state of Georgia or state medical
13   examiner.
14        Q.    All right.  As a consequence of that, I'm
15   sure you have testified many times in court and given
16   depositions, I assume?
17        A.    Oh, yes.
18        Q.    So I don't have to go through the rules of
19   the depositions and whatnot?
20        A.    Probably not.
21        Q.    Okay.  What about medical-legal issues,
22   have you functioned as an expert witness in any --
23   when I say medical-legal issues I'm talking
24   specifically medical malpractice claims.
25        A.    Oh, yes.
```

```
 1        Q.    And in what capacity or what function
 2   would you serve in cases such as that?
 3        A.    Well, I've served as a consultant.
 4   Really, the first time I started doing or becoming
 5   engaged in medical-legal consulting was in 1983.  And
 6   I look at about 50 to 60 new cases a year primarily,
 7   and the split is about 60 percent defense and 40
 8   percent plaintiff.  The majority of things, probably
 9   I would say three-quarters of the cases that I'm
10   involved in, specifically deal with medical
11   malpractice or medical negligence, with the bulk of
12   the thrust, I would say, being towards causation
13   issues.
14        Q.    Right.
15        A.    And the rest of the percentage would be
16   split among workman's compensation issues, wrongful
17   death issues, motor vehicle accidents, sort of
18   litigation, things like that.
19        Q.    Okay.  And would you say that the majority
20   of those types of cases involved an estate; that is,
21   the subject of the alleged malpractice is deceased?
22        A.    The majority, probably I would say maybe
23   80 to 90 percent of the cases I'm involved with, have
24   to do with -- I end up consulting on, in a medical
25   negligence setting involving death.
```

```
 1        Q.     So your function would be in those types
 2   of cases looking for a cause of death?
 3        A.     Among other things, yes, a cause of death
 4   or why it is that the person died or factors that may
 5   have contributed to the death, things like that.
 6        Q.     I got you.  Okay.  How many times have
 7   you -- you mentioned that you review, at least I
 8   heard, that you review 50 to 60 cases a year.  I
 9   assume not all of those go on to deposition testimony
10   or appearances in court, correct?
11        A.     Oh, that's correct, yes.
12        Q.     About how many times per year would you
13   say either by deposition or live testimony that you
14   are involved?
15        A.     Well, as far as just my consulting
16   practice, I probably give maybe an average of between
17   two and three depositions a month; sometimes it's
18   very slow and other times it picks up and things are
19   compressed in a short period of time.  And I'm
20   probably involved in appearing in a courtroom as a
21   consultant perhaps about maybe four to six times a
22   year.
23        Q.     And are these specific to medical-legal
24   cases or do they encompass the whole gamut of your
25   job description as you gave it to me earlier?
```

```
  1        A.    Okay.  Well, the majority of the
  2   depositions I give are related to my consulting
  3   endeavors, although there are a certain number that
  4   stem from my job.  In Georgia, depositions are not
  5   taken in criminal cases, so I don't do any -- I don't
  6   have to give any depositions in criminal cases and
  7   homicides.
  8             Courtroom testimony, it varies.  I mean
  9   I've been as high as 35 or 37 times a year.  The last
 10   year or so it seems to have slowed down a little bit,
 11   although I'm still autopsying a fair number of
 12   homicides.  But generally, probably maybe another 12
 13   to 20 times a year I'm in court in criminal matters.
 14        Q.    Okay.  And when you're using the term
 15   you're consulting, when you're hired as a consultant,
 16   you're using that term to mean outside of your duties
 17   as the medical examiner?
 18        A.    Yes.
 19        Q.    Okay.
 20        A.    Any civil litigation that I'm involved in
 21   that concerns a case that came through my office or
 22   that I dealt with or one of my staff dealt with as
 23   part of our job, I'm actually officially prohibited
 24   from -- well, from, say, from handling a case like
 25   that on a private basis.  Although my office charges,
```

```
 1  but the State -- the money goes to the State in those
 2  cases.
 3          Q.    I got you.
 4                The consulting business that you
 5  mentioned, does that have a name?  Is that a PFC or
 6  how is that listed?
 7          A.    Yes, I'm incorporated as a subchapter S
 8  corporation.  It's called Sperry Forensic Pathology
 9  Consultants, Incorporated.
10          Q.    Okay.  And do you know whether or not your
11  PFC or you individually are listed in any of the
12  rolls, some of these groups that procure experts or
13  attorneys are able to send in records and then the
14  various entities seek out experts, you know, specific
15  to the case?  Do you know if you're listed on the
16  rolls of any of those types of entities?
17          A.    Yes.  I know I'm listed on two.  One is
18  called Expert Resources, which is, I believe, outside
19  of Chicago, and I very rarely hear from them.  I've
20  maybe looked at three or four cases through their
21  service over the last 12 or 14 years.  It's very
22  uncommon.
23                The other, the only other service that I'm
24  affiliated with is out of Florida, and it's called
25  Rieback Medical-Legal Consultants, Incorporated.  I
```

```
 1   think it's in West Palm Beach, if I remember
 2   correctly.  Now, I do get maybe about 10 or 12 cases
 3   a year sent to me through Ms. Rieback's service.
 4             And those are the only two that I've ever
 5   been affiliated with.
 6        Q.    Okay.  And do you know, are you listed
 7   voluntarily with those or how is that arrangement?
 8   How did that come about, I guess?
 9        A.    Well, I really don't know exactly how it
10   is that I'm listed.  I'm not aware that my name is on
11   any web sites that they have, either one of those
12   organizations have.  And exactly how, you know, my
13   name along with others is listed is something I'm not
14   really sure of.
15        Q.    Okay.
16        A.    I've never advertised myself in any other
17   way.
18        Q.    Okay.
19        A.    And I'm not -- if either of those
20   companies market in some fashion, which I'm sure they
21   do, I'm not personally aware that my name, you know,
22   as my name, has ever been part of such a marketing
23   sort of thing.
24        Q.    Okay.  All right.
25             Do you know whether or not you reviewed
```

    1   any cases for the Plaintiff's attorney in this case,
    2   John Metz?  Have you ever worked with Mr. Metz
    3   before?
    4        A.    Yes, I have.  I probably reviewed maybe 10
    5   or 12 cases, I would say, going back about 13, 14
    6   years.
    7        Q.    Okay.  And do you know whether or not any
    8   of those cases that you reviewed had issues that are
    9   similar to that in this case, as you understand them
   10   to be?
   11        A.    I -- I have not reviewed any other cases
   12   for Mr. Metz that had, I would say, similar issues to
   13   this, no.
   14        Q.    Okay.  Did any of the cases, previous
   15   cases that you reviewed for him to date, result in
   16   deposition testimony?
   17        A.    Yes.  There have been a number, yes.
   18        Q.    All right.  Do you off the top of your
   19   head -- well, let me ask this first.  Do you have a
   20   list of those cases?  Would you be able to
   21   reconstruct names of those cases and where the cases
   22   were pending?
   23        A.    Well, I'll tell you what I do have.  I
   24   have, I guess I call it my Rule 26(b) list because --
   25   and you know what I mean.  And --

```
 1        Q.    Federal Court.
 2        A.    Exactly.  And it commences on December
 3   6th, 2002, and is accurate up to today, basically,
 4   and it lists every deposition and every time I've
 5   given testimony in a courtroom --
 6        Q.    Okay.
 7        A.    -- in a chronological fashion, or
 8   consecutively, between December 6th, of 2002, and
 9   today.  So there are cases of Mr. Metz's that are
10   mentioned in here both with regard to deposition
11   testimony and courtroom testimony.
12        Q.    All right.  And since you said that are
13   referenced here, I assume you have a copy of that
14   with you?
15        A.    Yes.  I brought it.  People like you
16   typically ask for it so I tend to bring it.
17             MR. BENTON:  Well, why don't we get a copy
18        of that and have that attached to the deposition
19        as Exhibit 2.
20             THE WITNESS:  Sure.
21             MR. BENTON:  That will save more time.  So
22        we will be out of here before you know it.
23             THE WITNESS:  Hey, I've heard that before.
24             MR. BENTON:  I mean it, though.
25             THE WITNESS:  Good.  Good.
```

```
 1
 2              (Defendant's Exhibit-2 was marked for
 3         identification.)
 4         Q.    (By Mr. Benton)  Not having the benefit of
 5    your CV, one more question about -- a couple more
 6    about your personal stuff.  Have you authored any
 7    articles that you would consider to be germane to the
 8    issues in this case?
 9         A.    No, I wouldn't say that I have.
10         Q.    Okay.  And what is your rate of
11    remuneration for depositions?  How much do you charge
12    an hour?
13         A.    For depositions:  I charge $1500 for a
14    deposition lasting up to two hours, and then $750 an
15    hour thereafter.
16         Q.    Okay.  You got my check, I take it; right?
17         A.    Yes, sir, I did.
18         Q.    Okay.  I don't think we will be using that
19    whole amount, but you can keep the change; all right?
20         A.    Well, thank you very much.  And my wife,
21    who really does all of the billing, she's the one
22    that would --
23         Q.    She'll appreciate it?
24         A.    -- would thank you as well.  She is very
25    religious about -- well, I'm a lot more flexible than
```

```
 1  she is, let us say.
 2      Q.   All right.  Well, I appreciate you taking
 3  the time out of your day here.
 4          Let's get to the specifics of this case.
 5  Do you recall when you were first contacted and the
 6  manner in which the communication was achieved?
 7      A.   Yes.  It was in the early part of October
 8  of this year, so about two months ago, and Mr. Metz
 9  sent me an e-mail and asked me to give him a call.
10          Then I talked to him and he briefly
11  described the aspects of this matter and asked if I
12  could assist in looking at the records and explaining
13  the pathophysiology of adrenal suppression and bone
14  loss with respect to chronic steroid or
15  corticosteroid administration and how it ultimately
16  affected Mr. Schneider.  And I said that I could do
17  that.
18      Q.   All right.  You said that was in October.
19  When did you first let Mr. Metz know that you held
20  opinions in the case that might be of interest to
21  him?
22      A.   Well, it was, oh, I think within about a
23  week or ten days he sent me a small packet of
24  records, and then I read through them, and then it
25  would be sometime afterwards, the earlier part of
```

```
 1   November, early to middle, I had spoke to him.  We
 2   didn't speak very long, but that's when I told him
 3   that I could -- I had opinions and I could help in
 4   clarifying, I think, the issue regarding the
 5   administration of the Kenalog and what it did to
 6   Mr. Schneider and the effects and that sort of thing.
 7        Q.    Okay.  Have you prepared a written report?
 8        A.    No, sir.
 9        Q.    Okay.  So the opinions that you held were
10   communicated orally or telephonically to him?
11        A.    Yes, sir.
12        Q.    Okay.  And to the best of your
13   recollection, that was early to mid November?
14        A.    Yes.
15        Q.    All right.  Can you tell me -- did you
16   bring with you your file or whatever was sent?
17        A.    Yes.
18        Q.    Okay.  Could you tell me what you did
19   review?
20        A.    Sure.  I have records from Dr. Moloney's
21   office, which are arranged chronologically, and these
22   are the --
23        Q.    The office --
24        A.    Yes, exactly, the office notes.  And they
25   commence on October 3rd of 1987 and go up through
```

```
 1  September 27th, 2004.
 2       Q.    Okay.
 3       A.    And they end with a note, a fax number of
 4  a Dr. McHenry.
 5       Q.    Okay.
 6       A.    And then I have what's called the office
 7  records of family doctor Marshall McHenry, M.D.
 8       Q.    Okay.
 9       A.    And then, actually, in fact I have this in
10  duplicate, but it's records from Dr. Nelson Watts and
11  the Bone Health and Osteoporosis Center, including
12  results of some blood tests and the various natures,
13  and then results of I think at least two different
14  bone density analyses --
15       Q.    Okay.
16       A.    -- and they're cross-referenced to each
17  other.
18             So that's all the records that I've been
19  sent.
20       Q.    Okay.  What about depositions?  Did you
21  receive any depositions?
22       A.    No, sir, I do not have any depositions.
23       Q.    Okay.  So we have the office notes of my
24  client, Dr. Moloney; the office notes of Dr. McHenry.
25             Do you know, are you able to tell me the
```

 1   dates, you know, the start date and end date of
 2   Dr. McHenry's notes?
 3        A.   Sure.  And some of Dr. McHenry's notes
 4   actually contain information regarding the bone
 5   density scans.  You know, that also is duplicated in
 6   the records from the Bone Health and Osteoporosis
 7   Center.
 8             So I'm looking through Dr. McHenry's
 9   records.  Let's see.  I see at least the patient
10   information sheet that appears to me to be something
11   that would have been filled out on an initial visit
12   anyway.  It's dated 9/14/04.  And then there's an
13   electrocardiogram.  There's also some letters from a
14   urologist, Dr. Pliskin, regarding a, looks like a
15   condyloma that Mr. Schneider had.
16             And some medical releases dated 9/14/04.
17   And then a couple of other -- at least one other
18   letter from a Dr. Manigold, having to do with seeing
19   Mr. Schneider in 2001 for a complaint of rectal
20   bleeding.  And then there's a bone density scan dated
21   9/16/04.  And also the endoscopy report from
22   September 11th, 2001.  How remarkable:  911.
23        Q.   Yes.
24        A.   See, life went on.  I was actually in
25   Greenland when that happened and it took me seven

```
 1   days to get back to the United States.
 2        Q.    Oh, gosh.
 3        A.    That was something.
 4        Q.    That's true.  That was a tough time.
 5        A.    Yes, it was.  I could talk for -- I could
 6   waste a lot of your time today talking about that.
 7        Q.    It's not like you can drive back from
 8   there.
 9        A.    No.  It was three plane flights and
10   another world basically.
11        Q.    Yes.
12        A.    And then, let's see, medication charts
13   just with some medications that had been administered
14   or given to Mr. Schneider between 9/14/04 and
15   9/27/05.  And then there is a progress note dated
16   April 21st of '05.  Let's see.  This appears to be an
17   initial history and physical.  Oh, here it is,
18   9/14/04.  And then another progress note from
19   January 27th of '05.
20              And then there's a letter dated
21   September 27th, 2004, from Dr. Moloney to Dr. McHenry
22   listing, it's basically three lines, listing
23   Mr. Schneider's medical problems, dermatologically
24   speaking, and nine medications that Mr. Schneider was
25   taking.  And then, finally, the one-page
```

```
 1  gastroenterology consultation from August 20th, 2001.
 2          So they're kind of a mish-mash variety of
 3  things.
 4      Q.    All right.  In the sum total of the
 5  records, Dr. McHenry, Dr. Watts, how many bone
 6  density studies do you have that indicate the
 7  results?
 8      A.    Okay.  Let me glance at this.
 9      Q.    And if you could, the dates for those if
10  there's more than one.
11      A.    Sure.  All right.  I have a density study
12  from 9/16/04, and then one from February 28th of
13  2007.  And those are the ones that I have results
14  for.
15      Q.    Okay.  I think there was another one in
16  '06.
17      A.    Yes.  I see the description -- well, wait
18  a second.  Yes.  I don't have the specific results
19  from the one from 2006.  There is mention made in the
20  progress note of February 28th, 2007, of a bone
21  density scan.  It just says, "In the spine, bone
22  density increased between 2004 and 2006, and
23  increased further between 2006 and 2007."  So there
24  is at least mention of, you know, that a scan had
25  been done.
```

```
 1        Q.    All right.
 2        A.    But I don't have results of one
 3   specifically from 2006.
 4        Q.    Okay.  In arriving at your opinions, which
 5   we'll get to hear in just a minute, did one or the
 6   other of the medical records of either Dr. McHenry,
 7   Dr. Moloney, or Dr. Watts play a larger part than any
 8   other in formulating your opinions?
 9        A.    Well, I would say -- I mean Dr. Moloney's
10   records essentially establish the frequency and
11   actually the specific times and dates when the
12   triamcinolone, or Kenalog, was administered to him on
13   a regular basis.  But it gives the actual dates,
14   then, of the administration over the period
15   between -- when was it -- 1987 and 2004.
16              And then, Dr. Watts's records, along with
17   some -- well, the bone scans actually, the bone
18   density scans, there's one that is in Dr. McHenry's
19   records and one that's in Dr. Watts's records.  But I
20   would say those show the evidence, then, of the
21   effect that the chronic administration of the Kenalog
22   had upon Mr. Schneider and, you know, the change in
23   his bone density.  But also that he has -- his bone
24   density has improved since he stopped the steroid
25   injections and has been receiving the Actonel.
```

```
 1        Q.    You do agree that Actonel is an
 2   appropriate treatment for loss of bone density,
 3   correct?
 4        A.    Yes.
 5        Q.    Okay.  You have not seen Mr. Schneider, I
 6   take it, right, or examined him or anything like
 7   that?
 8        A.    Correct, I have not personally seen him.
 9        Q.    Okay.  And if you can, can you tell me,
10   then, as you perceive it, what is your role in this
11   case?  What do you see as your function in this case?
12        A.    Well, I see my role as one of approaching
13   it from the causation standpoint; that is, why did
14   Mr. Schneider develop the problems that he did that
15   then ultimately were found to be related to
16   osteoporosis, or profound loss in bone density, and
17   how, then, did the chronic administration of the
18   Kenalog, or it's generic, triamcinolone, cause the
19   evolution of the loss of bone density.
20              In other words, what is the relationship
21   between the steroid administration and the ultimate
22   osteoporosis that Mr. Schneider, you know, was found
23   to have developed.
24        Q.    Okay.  And in your discussion or in your
25   analysis of the case, did you factor in the fact that
```

 1  this patient, Mr. Schneider, was a chronic smoker?
 2       A.    Well, yes.  Smoking is an element that is
 3  known to contribute to the evolution of osteoporosis,
 4  and can extenuate the effect that chronic steroid
 5  administration will have upon someone who is smoking
 6  at the same time.
 7       Q.    Okay.  Again, I'm not attempting to put
 8  words in your mouth, but as I'm understanding your
 9  role, or at least your perceived role, it is not your
10  intent to offer opinions on the standard of care of
11  Dr. Moloney; correct.  You're more to discuss the
12  effect of the chronic, if you will, use of Kenalog
13  over those number of years?
14       A.    Yes.
15       Q.    Okay.  As far as this patient's present
16  condition, how he has responded to treatment and all
17  that, would you defer to Dr. Watts, his treating
18  physician, regarding the loss of bone density?
19            MR. METZ:  Objection.
20            THE WITNESS:  Well, yes, with respect to
21  Mr. Schneider's response to treatment and --
22       Q.    (By Mr. Benton)  And prognosis?
23       A.    Yes, I was about to say that.
24            -- and his ultimate prognosis, I would say
25  Dr. Watts is going to be in a better position, you

```
 1  know, than I, at least to, you know, opine about how
 2  well Mr. Schneider may ultimately do.
 3       Q.    Okay.  That's fine.
 4             You would agree, I guess, that he does
 5  appear to be responding well to the Actonel and the
 6  cessation of the corticosteroid therapy; correct?
 7       A.    Yes.  That at least is what Dr. Watts's
 8  notes and studies indicate, and so I would agree with
 9  that assessment.
10       Q.    Okay.  I believe Dr. Watts determined or
11  at least indicated that he had made significant
12  improvement.  At least according to the records you
13  reviewed that would be consistent, wouldn't it?
14       A.    Yes.
15       Q.    Okay.  And do you hold the opinion that
16  because of that, that osteoporosis is in fact
17  treatable?
18       A.    Well, yes, it is treatable, certainly.
19  And it's going to be more treatable in some people as
20  compared with others.  But, you know, yes, it is
21  treatable.
22       Q.    Okay.  As far as this particular patient,
23  you are aware that at this point he, at least
24  Dr. Watts indicates that he is low risk for any
25  fracture?
```

```
 1      A.     Well, yes, that's what Dr. Watts's notes,
 2  you know, state; that is, Mr. Schneider's risk for
 3  fracture has improved based upon the increase in his
 4  bone density since he started -- since he stopped
 5  using the steroids and started on the Actonel.  I
 6  don't have a problem with that.
 7      Q.     Okay.  And one other kind of background
 8  thing here, I guess two others.
 9             I don't want to ask you anything that's
10  outside of your area, not intending to do that, so it
11  if it is, just tell me and I'll move on.
12             As far as the causes of osteoporosis, are
13  you able to state those with any, you know, level of
14  comfort?
15      A.     Yes.
16      Q.     Okay.  Can you list those, the ones that
17  come to mind anyway?  It's not a memory test.
18      A.     No, I understand.  I understand.
19             If you look at people who have
20  osteoporotic, the most common -- well, just starting
21  off is that every human being has gradual loss of
22  bone density after -- usually around the age of 30 is
23  when humans peak in their bone density and then they
24  start losing some of that bone density gradually as
25  they get older.
```

  1             Now, women will have a much more
  2  accelerated loss of bone density due to loss of
  3  estrogens after they go through menopause.  And
  4  elderly men also will have -- will develop
  5  osteoporosis because of loss of androgenic hormones
  6  and just changes in their hormonal structure as well
  7  as changes in calcium and vitamin D absorption and
  8  metabolism in the body.  So all human beings develop
  9  a certain element of bone loss as they age.
 10             You know, the difference, though, has to
 11  do -- or I guess -- well, the definitions really have
 12  to do with degree, that if a human being loses
 13  sufficient enough bone to start elevating their risk
 14  of fracture, especially spontaneous fractures, then
 15  that is termed osteoporosis.
 16             And, you know, the bone density studies
 17  actually that were in Mr. Schneider's chart really
 18  lay out the foundation for the concepts of what
 19  determines or what sets the diagnosis of osteoporosis
 20  with relationship to bone density and, thus, the
 21  increased propensity for fractures.
 22             So getting back to your original question,
 23  in a sense, the most common cause, if you look at
 24  just human beings, is getting older and especially in
 25  postmenopausal females.

```
 1              Now, once those particular age groups and
 2    sex groups have been eliminated, the next most common
 3    cause of osteoporosis actually is chronic steroid
 4    administration, or chronic specifically
 5    glucocorticoid steroid administration, of which there
 6    are a number of different types of glucocorticoids,
 7    all of which have varying degrees of potency and
 8    duration, but ultimately their effect is the same in
 9    that chronic administration, or administration longer
10    than six months consecutively will lead to loss of
11    bone density and long-term -- well, if someone
12    continues using steroids, glucocorticoid steroids
13    regularly thereafter, they will continue to develop
14    more and more bone loss.
15              So once you eliminate the natural age and
16    hormonal sex-related causes of osteoporosis, the next
17    most common cause, like I said, is chronic steroid
18    administration.  Then after that, there are esoteric
19    diseases like Paget's disease of bone or
20    radiation-induced osteoporosis and some things like
21    that, that have a fairly well-defined cause.
22              And then there are, you know, more
23    uncommonly, idiopathic osteoporosis where a person
24    may develop osteoporosis at a younger age than they
25    should statistically for no particular cause, but
```

```
 1    that's pretty rare.
 2         Q.    And there are genetic factors, I take it?
 3         A.    Yeah.  Oh, I don't mean to interrupt you.
 4    I mean not every woman, say, for instance, is going
 5    to develop symptomatic osteoporosis as she ages.  So
 6    if a woman has osteoporosis problems in her family,
 7    you know, in her mother or mother's mother or things
 8    like that, there is an increased likelihood, sure.
 9         Q.    All right.  That gives me a pretty good
10    understanding.
11              So basically I'm going to lump the age
12    factors that you mentioned, male and female,
13    postmenopausal women, elderly males, that type of
14    thing, into just a sub group age.
15              The second most common, then, would be
16    chronic corticosteroid use or gluco --
17         A.    Yes.
18         Q.    Okay.  And the third, there would be
19    several other areas you would go from there, either
20    genetic or, as you say, idiopathic type of responses;
21    correct?
22         A.    Yes.
23         Q.    Okay.  Are you aware of whether or not at
24    this point any of his physicians, could you tell, or
25    Dr. McHenry or Dr. Watts, had placed any restrictions
```

```
 1   on physical activity for Mr. Schneider?
 2        A.    I don't recall reading anything to that
 3   effect in Mr. Schneider's charts.
 4        Q.    Okay.  I guess I want to also ask how
 5   would you factor in the role of smoking in those --
 6   if you had those three, really one, two, and then I
 7   kind of lumped I guess a lot of different causes into
 8   the third group -- but how would you throw in the
 9   role of smoking into any of those?  Is there a known
10   quantity or quantum that smoking effects the
11   incidence of osteoporosis --
12              MR. METZ:  Objection.
13        Q.    -- or is it just a degree?
14              MR. METZ:  Objection.
15              THE WITNESS:  To my understanding, it's
16         more of a -- the knowledge that cigarette
17         smoking will take osteoporosis -- essentially
18         take a bad situation and has the potential to
19         make it worse.  And also, if someone is being
20         treated for osteoporosis, that continued smoking
21         may interfere with the response to the
22         treatment.
23              It won't interfere, as I understand it, in
24         the sense that it completely negates the
25         treatment.  But if someone smokes cigarettes,
```

```
 1          the likelihood is that they'll have a better
 2          response to the treatment if they stop smoking.
 3          So that's my understanding at least.  It's an
 4          element of degrees.
 5               And probably the better understanding of
 6          that is related to individuals with severe
 7          emphysema from chronic smoking who have been on
 8          chronic steroid administration because they need
 9          that essentially in order to survive, and as a
10          consequence they developed osteoporosis over the
11          passage of time.  And it's been found that
12          people, people in that situation with those
13          underlying disease issues, tend to respond a
14          little better if they have stopped smoking as
15          compared to those people with emphysema who
16          continue to smoke.
17          Q.    (By Mr. Benton)  Okay.  So the thought is
18     that would carry over to the other areas, too?  Is
19     that what -- I guess it has a detrimental effect on
20     the healing process?
21          A.    Yes, that's essentially my understanding,
22     that the best way to optimize the response to
23     treatment in someone with osteoporosis is to stop
24     smoking.
25          Q.    Sure.  And I realize that most of your
```

```
 1  patients have expired.  But you do deal with, you
 2  know, examination-wise, other patients.  But as a
 3  physician, you would agree that patients have a duty
 4  to contribute in their care, do they not?
 5       A.   Oh, to certain elements, yes.  I mean I'm
 6  an insulin-dependent diabetic and I have a spare tire
 7  around my stomach and I know I ought to get rid of it
 8  but I don't; that's the way life is.
 9            But, you know, certainly patient
10  cooperation is always part of any treatment, you
11  know, protocol or regimen of any sort.  I don't have
12  a problem with that.
13       Q.   Okay.  Well, the other thing, at least in
14  the information that you reviewed -- and certainly
15  I'm not aware of any other bone density studies other
16  than the three we mentioned.  But we don't have a
17  baseline bone density study, do we?
18       A.   No.  There never was a baseline study done
19  any time prior to the first one in 2004.
20       Q.   Okay.  Well, let's get to the heart of the
21  matter here, then.
22            You kind of pretty much touched on the
23  area that you intend to opine.  But I guess I'd like
24  to -- if you have specific opinions about the case,
25  let's list those and then go into those.  Or is it --
```

```
 1   well, I'll just ask you to list those.  It may only
 2   be one.  Who knows?
 3        A.    Certainly.  Well, it's really relatively
 4   simple:  That between October of 2000 -- well, excuse
 5   me -- October of 1987 and then, finally, September of
 6   2004, Mr. Schneider received continuous and repeating
 7   doses of triamcinolone in various forms.
 8   Occasionally he received the Celestone, which is a
 9   Betamethasone -- it's another glucocorticoid, but
10   it's -- you know, they're all within the same family.
11            But the majority of injections he received
12   were either Kenalog, which is just a brand name for
13   triamcinolone, a cinonide, or generic triamcinolone
14   or cinonide itself, or TCA.  I went through the
15   records, and I'm not saying this is completely
16   accurate, but I counted -- I finally got up to 140
17   separate injections that he received during that time
18   frame.  And that may not be completely accurate
19   because I got distracted a couple of times and almost
20   lost count.  But I did count at least 140 times.
21            And given the duration of action of
22   intramuscular Kenalog and the immunosuppression, or
23   adrenal suppression, that would last from a typical
24   40 milligram dose, essentially Mr. Schneider had near
25   continuous suppression of the hypothalamic pituitary
```

```
 1   adrenal access for the entire time period that he was
 2   receiving these injections.
 3              And this -- well, any definition that
 4   describes chronic steroid use sets the time frame at
 5   6 months.  So essentially anyone who is administered
 6   steroid medications for any purpose longer than six
 7   months, that is considered to be chronic or long-term
 8   steroid use.  And so his was more on the order of
 9   about, what, 17 years.
10              And given the dosage of the medication he
11   received, the type of medication, and the duration of
12   action of a typical 40 milligram dose of Kenalog,
13   this would produce continuous adrenal suppression for
14   this entire time, time frame, and this would also
15   interfere, then, with absorption of calcium and
16   vitamin D and lead to one of the most well-known and
17   recognized complications of chronic steroid
18   administration, and that's osteoporosis.
19              So I think there is a direct cause and
20   effect relationship between the Kenalog, or TCA, that
21   he received, the dosage interval, and the entire time
22   span that he received the medication, and the
23   development at a young age in a male of significant
24   osteoporosis which, for, you know, a male in his 20s
25   into 30s is vanishingly rare.
```

1    As I said, chronic steroid use is, you
2  know, the most common cause of osteoporosis absent
3  the elderly individuals, male and female, that we
4  spoke of earlier.
5    So that's the essence of my opinion, is
6  that the administration of the Kenalog, or the
7  generic form, the TCA, was directly responsible for
8  adrenal suppression for a period of well over a
9  decade, and the development of the osteoporosis is a
10  significant known and recognized complication.
11   Q.   All right.  And since we don't have a
12  baseline, I guess the strongest you can be is that
13  certainly contributed to his bone density, I don't
14  know if you would say loss, but a substandard bone
15  density?
16   A.   Well, yes.  I think that that is extremely
17  well known.  I mean osteoporosis and chronic steroid,
18  chronic corticosteroid use, whether it's Kenalog or
19  any other corticosteroid, go hand-in-hand.  And I
20  think it's pretty well-recognized in just about every
21  medical specialty and nursing as well.
22    And I think one of the elements that also
23  is quite important is the fact that when he
24  ultimately was diagnosed with the severe
25  osteoporosis, he had had a good response to the

```
 1   Actonel with an increase in bone density.  So that --
 2   it's like, you know, well, if a medical condition is
 3   recognized and you treat it with the appropriate
 4   treatment and there's a good response, that basically
 5   establishes why the condition was there to start with
 6   to some extent, if you follow what I'm saying.
 7        Q.    Sure, I do.
 8              And of course we don't, I guess,
 9   technically speaking, we don't know if it was the
10   Actonel or a combination of the Actonel with the
11   cessation of the use of the steroids; correct?  I
12   mean stopping the use, the chronic use of steroids
13   will in itself result in restoration of bone density,
14   correct?
15        A.    To some extent.  Although, as I said
16   earlier, after the age of 30 we all start losing bone
17   very slowly.  Now, how the body then responds to the
18   cessation of steroids, steroid use, usually is more
19   in the positive -- there will be an improvement.  And
20   the Actonel physiologically actually blocks the
21   osteoclasts, or the cells in the bone that break down
22   the bone, and so it allows, say, a more positive
23   balance in bone restoration.
24              So you're correct in the sense that there
25   is some improvement just after, or improvement in
```

 1  bone density after stopping the corticosteroids, and
 2  the Actonel physiologically enhances that
 3  improvement.
 4       Q.    And pathologically speaking, the cessation
 5  of the steroids would result in no longer enduring
 6  adrenal suppression, that there would then be a
 7  resumption, if you will, or an increase in the
 8  absorption of calcium, correct?
 9       A.    Yes, correct.  And it's interesting that
10  you mention that, because it generally takes about a
11  year after the cessation of chronic steroid use for
12  the adrenal glands to begin functioning completely
13  normally, and the correction in the calcium and
14  vitamin D absorption and homeostasis to take effect.
15  But ultimately, yes.
16       Q.    Okay.  Given the fact that the second, I
17  guess, the second leading cause, if you phrase it
18  that way, second leading cause of loss of bone
19  density -- I'm using loss of bone density instead of
20  osteoporosis because somebody told me that you can't
21  really define or call it osteoporosis until there's
22  been a fracture, and I think that was kind of a
23  technical definition, but just so terminology-wise
24  we're on the same page.
25            Since the second leading cause of the loss

```
 1   of bone density, or osteoporosis, is the chronic use
 2   of the glucocorticoid steroids, it is a common -- I
 3   don't want to say common; that's bad.  Never say
 4   common to a doc -- but it is certainly not an
 5   uncommon phenomenon, correct?
 6       A.    Well, yes.  Steroids are ubiquitous in
 7   many respects.  They're used to treat many, many
 8   types of disease conditions.  And, as you know, they
 9   work very well for certain things; unfortunately, the
10   osteoporosis, or decrease in bone density, however,
11   you wish -- well, osteopenia probably is a better way
12   to look at it.  That particular term -- and maybe
13   that's been defined to you, but osteopenia means loss
14   of bone density before symptoms develop.  So it's
15   essentially asymptomatic bone density loss that's
16   equivalent to one standard deviation below the
17   average mean of bone density for age and sex.
18           So having said all of that, since the
19   advent and development of steroid medications post
20   World War II, the condition of complications relating
21   to steroid use certainly have been known and
22   recognized.  And a little bit ago I touched on their
23   use in individuals with chronic obstructive pulmonary
24   disease, and that is a very common -- well, COPD is
25   an extremely common condition.  And, sadly, many
```

```
 1   people with advanced COPD become defendant on steroid
 2   medications, essentially to live.  And again, as a
 3   consequence they develop osteoporosis.
 4           And so that is a -- you know, that's one
 5   of the better, I would say more frequent clinical
 6   scenarios where osteoporosis or osteopenia is
 7   encountered from chronic steroid use.
 8       Q.    While we're on that subject --
 9           MR. METZ:  Can I just jump in here and say
10   I was trying to get an objection in before the
11   answer.
12           MR. BENTON:  I'm sorry.  Go ahead.
13           MR. METZ:  Dr. Sperry jumped in too quick.
14           So I just wanted, for the record, to state
15   my objection.
16           MR. BENTON:  Okay.  That's fine.  That's
17   it?  You're finished?
18           MR. METZ:  Yes.
19           MR. BENTON:  Okay.
20       Q.    (By Mr. Benton)  Dr. Sperry, while we were
21   talking about that -- again, this is not a memory
22   test, but just for my own information -- what other
23   types of disease/conditions would treatment by
24   steroids result in chronic, definitionally, a chronic
25   use of steroid?
```

     1          A.     Well, one of the more common ones would be
     2     the treatment of arthritis.  There's a lot of
     3     different types of arthritis.  And, in fact, when
     4     steroid, corticosteroid medications were first
     5     synthesized after World War II, one of the patient
     6     populations that was found to have a wonderful
     7     response were people with rheumatoid arthritis, and
     8     it was almost the miracle drug, until the various
     9     complications in these patients developed, including
    10     diabetes, and essentially evolvement of what's called
    11     the Cushing syndrome, of which osteoporosis is one of
    12     the known complications in all of this process.
    13          So, you know, I mean people with chronic
    14     arthritis, say, that, you know, may need steroids in
    15     order simply to function, but there's a definite
    16     downside to that.
    17          Q.     Sure.
    18          A.     So this is why in the treatment of any
    19     type of medical condition that needs steroids, the
    20     need for the treatment and the duration of the
    21     treatment has to be weighed against the potential
    22     complications that can develop from the treatment
    23     itself, that may in and of themselves be worse than
    24     the disease you're treating.
    25          Q.     Sure.

```
 1        A.    So that's the balance that goes into the
 2  utilization of any kind of glucocorticoid steroid
 3  medication.
 4        Q.    Sure.  While we're on the subject, other
 5  than arthritis, any other conditions come to mind
 6  that would respond to chronic use of steroids?
 7        A.    Well, many types of dermatologic problems
 8  that involve inflammation of the skin will certainly
 9  respond to steroid administration.  But then, of
10  course, you know -- and they'll respond in the short
11  term -- but then that's when the question, if the
12  person needs to continue on treatment, will the
13  complications that the corticosteroid drugs cause be
14  worse systemically than the inflammatory skin
15  condition that you're treating.
16              I mean steroid creams and sometimes even
17  injected steroids are used, I know, in a myriad of
18  dermatology situations.  But, you know, just with
19  those caveats in mind that you have to weigh the
20  disease itself or the medical condition and the
21  treatment required, such as steroids, to treat that
22  condition versus resultant complications that can be
23  much more serious than the skin problem you were
24  setting out to treat at the beginning.
25        Q.    Again, while I'm thinking of this, do you
```

```
 1  have any data on, if you looked at all chronic
 2  steroid users, what percentage of those would go on
 3  to develop, you know, an osteopenia or osteoporosis?
 4      A.    Well, you know, that's actually relatively
 5  interesting.  I did bring along an excerpt from an
 6  endocrinology textbook today with me that I was going
 7  to give to you, but -- I brought it for your use.
 8  The chapter is on glucocorticoid therapy, and it's
 9  interesting that it says, "Essentially more than
10  one-fourth of patients on long-term therapy will
11  sustain osteoporotic fractures."
12             And that usually -- you know, you
13  mentioned earlier about fractures being a sign of
14  osteoporosis or, really, the diagnosis of that.  But,
15  you know, things such back pain, things as that, can
16  at least, you know, get the diagnosis made.  So in
17  essence, you know, that's at least what one study has
18  shown, that this, you know, as many as a quarter of
19  people -- and again using the definition of long-term
20  steroid therapy meaning lasting longer than six
21  months.
22      Q.    Yes.  I understood that was your
23  definition.
24      A.    So in any case, that's at least one, what
25  one study has shown.
```

     1          Q.    Okay.  That answers the question.  Okay.
     2                I've enjoyed this discussion.  And I want
     3     to be sure, before I sign off here, are there any
     4     other -- as you say, your testimony is pretty
     5     straightforward as far as the area you intend to
     6     comment on.
     7                Is there any other opinions you intend to
     8     give that we have not discussed?
     9          A.    I don't think so.  I guess just, you know,
    10     so your record is clear, I believe in my conversation
    11     with you I think you have understood what I said.
    12     But I just want to restate my opinion in just a
    13     little bit different way.
    14          Q.    Sure.
    15          A.    In essence, but for the administration of
    16     the Kenalog by Dr. Moloney over this 17-year period,
    17     it's my opinion that Mr. Schneider would not have
    18     developed osteoporosis, you know, and that was
    19     ultimately diagnosed and treated.
    20                Like I say, I think I'm saying pretty much
    21     what I said before but just phrasing it in a little
    22     bit different way.
    23          Q.    I agree.  That's what I understood you to
    24     be --
    25          A.    Good, because I like to make sure that I'm

```
 1   communicating as best as I can.
 2        Q.    Well, I appreciate it.  I've been lost in
 3   translation sometimes.  So I think we're
 4   communicating here.
 5        A.    Okay.  Good.
 6        Q.    Anything else?  Anything else that comes
 7   to mind?  I think that pretty well summarized what I
 8   understood your testimony to be.
 9        A.    No, I think that's it.
10            MR. BENTON:  Okay.  Then I appreciate your
11         time, Doctor.  And I'm sorry, again, that I
12         couldn't get down there personally.  No
13         disrespect intended.
14            THE WITNESS:  Oh, absolutely none.  I
15         understand completely.
16            MR. METZ:  This is Mr. Metz.  I just
17         wanted to clarify one thing, if I could.
18            MR. BENTON:  Sure.
19   DIRECT EXAMINATION
20   BY-MR.METZ:
21        Q.    Doctor, you were talking to Mr. Benton
22   about low risk of a fracture.  Do you mean back to
23   normal, then?
24        A.    No.  No.  All that means is from a
25   statistical perspective that his risk of fracture has
```

```
 1   decreased.  And, in fact, if you would look at the
 2   bone density studies, the definition essentially of
 3   the numerical analysis is that for every one point
 4   below the average, or one standard deviation below
 5   the average bone density, the risk of a fracture
 6   doubles.
 7           So essentially, at least based upon the
 8   last bone density scan, Mr. Schneider is not back to
 9   the average for, you know, an adult human being.  And
10   certainly one of the problems that exists is that
11   Mr. Schneider is still a young man, too.  So for him
12   to have such extensive osteoporosis at a young age
13   carries, you know, a greater risk of ultimately
14   developing a fracture anyway, just because he should
15   not have that decreased bone density.
16           So, in essence, he is not back to at least
17   the normal average yet.  But his likelihood of a
18   fracture is decreased.
19       Q.    And I guess, just technically, are you
20   licensed to practice medicine?
21       A.    Oh, yes.
22       Q.    In what states?
23       A.    Georgia, Kansas, and New Mexico.
24       Q.    Okay.  And I think, lastly, the facts or
25   data that you have used for your opinion, are those
```

```
 1   of a type reasonably relied upon by experts in your
 2   field in forming opinions upon the subject?
 3              MR. BENTON:  Objection to form.  Go ahead.
 4              THE WITNESS:  Yes.
 5              MR. METZ:  All right.  I don't have
 6        anything further.  Oh, yes, I do have one more.
 7        Q.    (By Mr. Metz)  Are the opinions that
 8   you've given today within a reasonable degree of
 9   medical probability?
10        A.    Yes.
11              MR. METZ:  Okay.  That's it, then.
12              MR. BENTON:  Okay.
13              THE WITNESS:  Good.
14              MR. BENTON:  Thank you, doctor.
15              THE WITNESS:  Thank you.  It's been a
16        pleasure.
17              MR. METZ:  Thank you.  Take care.
18              MR. BENTON:  Madam Court Reporter, I would
19        like a regular and a condensed, and if you have
20        e-tran I would prefer that also.
21              THE REPORTER:  I do.  Would you please
22        tell me your e-mail address.
23              MR. BENTON:  Yes.  It is bbllaw@fuse.net.
24              (Deposition concluded at 3:18 p.m.)
25              (Pursuant to Rule 30(e) of the Federal
```

```
 1          Rules of Civil Procedure and/or O.C.G.A.
 2          9-11-30(e), signature of the witness has been
 3          waived.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
00047
  1                    INDEX TO EXHIBITS
  2
  3   DEFENDANTS'
  4     EXHIBIT           DESCRIPTION
  5
  6       1       Curriculum Vitae
  7
  8       2       Rule 26(b) List
  9
 10    (Original Exhibits 1 and 2 have been attached to
 11   the original transcript.)
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

1                         CERTIFICATE
2
3    STATE OF GEORGIA:
4    COUNTY OF FULTON:
5
6            I hereby certify that the foregoing
7        transcript was taken down, as stated in the
8        caption, and the questions and answers thereto
9        were reduced to typewriting under my direction;
10       that the foregoing pages 1 through 46 represent
11       a true, complete, and correct transcript of the
12       evidence given upon said hearing, and I further
13       certify that I am not of kin or counsel to the
14       parties in the case; am not in the regular
15       employ of counsel for any of said parties; nor
16       am I in anywise interested in the result of said
17       case.
18           This, the 17th day of December 2007.
19
20
21           KATHLEEN CILENTI, CCR B-594
22
23
24
25

1                    COURT REPORTER DISCLOSURE

2           Pursuant to Article 8.B. of the Rules and
    Regulations of the Board of Court Reporting of the
3   Judicial Council of Georgia which states:  "Each
    court reporter shall tender a disclosure form at the
4   time of the taking of the deposition stating the
    arrangements made for the reporting services of the
5   certified court reporter, by the certified court
    reporter, the court reporter's employer, or the
6   referral source for the deposition, with any party to
    the litigation, counsel to the parties or other
7   entity.  Such form shall be attached to the
    deposition transcript," I make the following
8   disclosure:
            I am a Georgia Certified Court Reporter.  I am
9   here as a representative of Brown & Gallo, LLC.
10  Brown & Gallo, LLC, was contacted to provide court
11  reporting services for the deposition.  Brown &
12  Gallo, LLC, will not be taking this deposition under
13  any contract that is prohibited by O.C.G.A.
14  15-14-37(a) and (By Mr. Benton).
15          Brown & Gallo, LLC, has no contract/agreement to
16  provide reporting services with any party to the
17  case, any counsel in the case, or any reporter or
18  reporting agency from whom a referral might have been
19  made to cover this deposition.  Brown & Gallo, LLC,
20  will charge its usual and customary rates to all
21  parties in the case, and a financial discount will
22  not be given to any party to this litigation.
23
24
25                    KATHLEEN CILENTI, CCR-B-594